PCM/TMS/NSD: USAO 2025R00683

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CRIMINAL NO. MJM 26cr 30 |
| | * | |
| AURELIO LUIS PEREZ-LUGONES, | * | (Transmission of National Defense |
| | * | Information, 18 U.S.C. § 793(e); Retention |
| Defendant | * | of National Defense Information, 18 U.S.C. |
| | * | § 793(e); Forfeiture, 18 U.S.C. § 793(h), |
| | * | 21 U.S.C. § 853) |
| | * | |

*****

### INDICTMENT

The Grand Jury for the District of Maryland charges that:

### GENERAL ALLEGATIONS

At all times relevant to this Indictment, unless otherwise indicated:

### Introduction

1.      The defendant, **AURELIO LUIS PEREZ-LUGONES ("PEREZ-LUGONES")**, resided in Laurel, Maryland, and held a TOP SECRET//SENSITIVE COMPARTMENTED INFORMATION ("SCI") security clearance since at least 1995.  From 1982 to 2002, **PEREZ-LUGONES** served in the U.S. Navy.

2.      For more than two decades, **PEREZ-LUGONES** worked as a systems engineer and information technology specialist for a government contractor.  In that capacity, **PEREZ-LUGONES** worked on contracts for the U.S. Intelligence Community.  To perform his duties as a systems administrator, **PEREZ-LUGONES** had access to classified systems and networks and worked inside a sensitive compartmented information facility ("SCIF").

3.     As a security clearance holder, **PEREZ-LUGONES** received instruction and training on the proper handling of classified information, including the proper storage of classified material.  As part of his employment, **PEREZ-LUGONES** was required to complete annual trainings relating to the proper marking and handling of classified information.  As recently as on or about September 2025, **PEREZ-LUGONES** completed training on the proper handling of classified information and the prohibitions against the unauthorized disclosure of classified information.

4.     Between October 2025 and January 2026, **PEREZ-LUGONES** accessed and viewed classified intelligence reports and summaries produced by various government agencies.  Despite **PEREZ-LUGONES** having no work-related reason or need to view these documents, **PEREZ-LUGONES** nevertheless covertly printed and took handwritten notes about these classified documents.  During this period, **PEREZ-LUGONES** repeatedly removed classified national defense information from the SCIF in which he worked and transmitted it to a reporter ("Reporter 1"), who was not authorized to receive it.  In turn, Reporter 1 co-authored and contributed to at least five articles that contained classified information provided by **PEREZ-LUGONES**, resulting in the dissemination of that information to the public.

#### Classified Information

5.     Executive Order 13526 governed the classification of national security information.  Information in any form may be classified if it: (1) was owned by, was produced by or for, or was under the control of the U.S. government; (2) could, if disclosed, cause harm to the national security of the United States; and (3) was classified by or under an Original Classification Authority ("OCA"), an individual authorized to classify information and make classification decisions.

6.     Pursuant to Executive Order 12958 signed on April 17, 1995, as amended by Executive Order 13292 on March 25, 2003, and Executive Order 13526 on December 29, 2009,

national security information was classified as "TOP SECRET," "SECRET," or "CONFIDENTIAL." National security information was information owned by, produced by, produced for, and under the control of the U.S. government that was classified as follows:

    a.    Information was classified as TOP SECRET if the unauthorized disclosure of that information reasonably could be expected to cause exceptionally grave damage to the national security that the original classification authority was able to identify and describe.

    b.    Information was classified as SECRET if the unauthorized disclosure of that information reasonably could be expected to cause serious damage to the national security that the original classification authority was able to identify and describe.

    c.    Information was classified as CONFIDENTIAL if the unauthorized disclosure of that information reasonably could be expected to cause damage to the national security that the original classification authority was able to identify and describe.

7.    Under Executive Order 13526, "damage to the national security" meant harm to the national defense or foreign relations of the United States from the unauthorized disclosure of information, taking into consideration such aspects of the information as the sensitivity, value, utility, and provenance of that information.

8.    The classification marking "NOFORN" indicated that the information was "Not Releasable to Foreign Nationals" and dissemination of that information was limited to United States nationals. The classification marking "REL TO" indicated that the information was releasable only to foreign nationals of specified countries, international organizations, or multinational forces. The classification marking "REL TO USA, NATO" indicated that the information could only be released to nationals of the United States or NATO member states.

9.    Classified information related to intelligence sources, methods, and analytical processes was designated as "Sensitive Compartmented Information" or "SCI" and subject to additional controls. SCI was to be processed, stored, used, and discussed only in an accredited

SCIF, and only individuals with the appropriate security clearance and additional SCI permissions were authorized to have access to such national security information.

10.    The National Institute of Standards and Technology defined a SCIF as an area, room, group of rooms, buildings, or installation certified and accredited as meeting Director of National Intelligence security standards for the processing, storage, and/or discussion of sensitive compartmented information.

11.    Intelligence Community Directive 705, titled "Sensitive Compartmented Information Facilities," signed on May 26, 2010, by the Director of National Intelligence, provided that "all SCI must be processed, stored, used, or discussed in an accredited SCIF."

12.    Pursuant to Executive Order 13526, information classified at any level could only be lawfully accessed by persons determined by an appropriate U.S. government official to be eligible for access to classified information, who had signed an approved non-disclosure agreement, received a security clearance, and had a "need to know" the classified information.  Classified information could only be stored in an approved facility and container.

### PEREZ-LUGONES's Unauthorized Removal and Transmission of National Defense Information

13.    Between in or around October 2025 and January 2026, **PEREZ-LUGONES** repeatedly accessed classified reports, printed or otherwise copied the information in these classified reports, removed the printouts and information from the SCIF, and then transmitted this classified national defense information to Reporter 1.  **PEREZ-LUGONES** was never authorized to remove this classified information from the SCIF or to transmit it to an individual not authorized to receive it.

14.    On or around October 28, 2025, **PEREZ-LUGONES** searched for, accessed, and viewed a TOP SECRET//SCI//NOFORN classified intelligence report relating to a foreign country

("Country 1"). **PEREZ-LUGONES** took a screenshot of the intelligence report and pasted the screenshot into a Microsoft Word document (hereinafter "Classified Document A"). One of the screenshots taken by **PEREZ-LUGONES** rendered a portion of the intelligence report unreadable due to how the screenshot was cropped. **PEREZ-LUGONES** also opened an attachment to the intelligence report, took screenshots of that attachment, and pasted those screenshots into Classified Document A. Shortly thereafter, **PEREZ-LUGONES** printed Classified Document A.

15.    On or around October 31, 2025—three days after **PEREZ-LUGONES** accessed and took screenshots of the intelligence report—Reporter 1 co-authored an article that contained much of the classified information that was set forth in Classified Document A. The article omitted the information contained in the portion of the intelligence report that had been rendered unreadable in the screenshots taken by **PEREZ-LUGONES**.

16.    On or around November 5, 2025, **PEREZ-LUGONES** accessed classified summaries of intelligence reports related to Country 1. Some of these summaries were classified as SECRET//NOFORN. **PEREZ-LUGONES** took a screenshot of these summaries and pasted it into a Microsoft Word document (hereinafter "Classified Document B"). **PEREZ-LUGONES** subsequently took additional screenshots, including information relating to Country 1, and pasted these screenshots into Classified Document B. Later the same day, **PEREZ-LUGONES** printed Classified Document B.

17.    On or around November 11, 2025, Reporter 1 co-authored an article that contained portions of the classified information set forth in Classified Document B.

18.    On or around December 4, 2025, **PEREZ-LUGONES** accessed a different intelligence report related to Country 1. This report was classified as CONFIDENTIAL//NOFORN. **PEREZ-LUGONES** took a screenshot of the report and pasted the screenshot into a blank

5

Microsoft Word document (hereinafter "Classified Document C"). Shortly thereafter, **PEREZ-LUGONES** printed Classified Document C and departed the SCIF.

19. On or around December 8, 2025, Reporter 1 co-authored an article that contained portions of the classified information set forth in Classified Document C.

20. On or around January 5, 2026, **PEREZ-LUGONES** accessed a third intelligence report related to Country 1. This report was classified at the SECRET level. The following day, **PEREZ-LUGONES** took handwritten notes in a yellow notepad while viewing classified intelligence reports on his work computer. Subsequently, **PEREZ-LUGONES** removed approximately three pages from the yellow notepad, folded the pages in half, and, several hours later, removed them from the SCIF.

21. On or around January 6, 2026, Reporter 1 contributed to a published article that contained classified information that appeared in the same intelligence report that **PEREZ-LUGONES** viewed on January 5, 2026.

22. Two days later, on or around January 8, 2026, **PEREZ-LUGONES** accessed a classified report relating to Country 1. This report was classified as SECRET//NOFORN. **PEREZ-LUGONES** copied information from the report, pasted it into another application, and printed it out (hereinafter "Classified Document D"). **PEREZ-LUGONES** cut off header information from Classified Document D, thereby removing his name from the document. Additionally, also on January 8, 2026, **PEREZ-LUGONES** copied and printed information from another report classified as SECRET//REL TO USA, NATO (hereinafter "Classified Document E").

23. On or around that same day, **PEREZ-LUGONES** was arrested. Prior to his arrest, during the execution of a court-authorized search warrant for **PEREZ-LUGONES's** mobile phone, law enforcement found messages between **PEREZ-LUGONES** and Reporter 1 sent via an encrypted messaging application on or around January 7 and 8, 2026. The messages discussed the

6

classification level of certain documents, set forth details about which U.S. government agencies had produced different reports, and explained how certain documents would be referenced in forthcoming news articles. As part of these messages, **PEREZ-LUGONES** also sent audio messages to Reporter 1 wherein he provided additional details about the information that he had transmitted.

24.    The search also revealed that **PEREZ-LUGONES** had transmitted photographs of classified documents, including Classified Document D and Classified Document E, to Reporter 1 on or around January 8, 2026. After transmitting one such document, **PEREZ-LUGONES** wrote, "I'm going quiet for a bit . . . just to see if anyone starts asking questions." Redacted images of certain of these messages are provided below.

 

25.    At around this same time, a court-authorized search revealed a hard copy printout of Classified Document D with the header information removed in **PEREZ-LUGONES's** lunchbox.

26.    On or around January 9, 2026, Reporter 1 co-authored an article that contained classified information set forth in Classified Document D.

## THE CHARGES

### COUNTS ONE THROUGH FIVE
### (Transmission of National Defense Information)

27.     Paragraphs 1 through 26 of this Indictment are incorporated by reference as though

fully set forth herein.

28.     On or about the dates indicated below, in the District of Maryland and elsewhere,

the defendant,

### AURELIO LUIS PEREZ-LUGONES,

having unauthorized possession of, access to, and control over documents, writings, and notes

relating to the national defense, and information relating to the national defense which information

he had reason to believe could be used to the injury of the United States or to the advantage of any

foreign nation, willfully communicated, delivered, and transmitted and caused to be communicated,

delivered, and transmitted the same to a person not entitled to receive it, to wit: **PEREZ-**

**LUGONES** sent Reporter 1 via an encrypted messaging application the classified national defense

information described below:

| COUNT | APPROXIMATE DATE OF TRANSMISSION | DOCUMENT DESCRIPTION | HIGHEST CLASSIFICATION LEVEL OF INFORMATION IN DOCUMENT |
|-------|----------------------------------|----------------------|---------------------------------------------------------|
| 1 | Oct. 28, 2025 | Classified Document A: Printout containing screenshots of intelligence report relating to Country 1. | TOP SECRET//SCI//NOFORN |
| 2 | Nov. 5, 2025 | Classified Document B: Printout containing screenshots of intelligence report summaries relating to Country 1. | SECRET//NOFORN |

8

| COUNT | APPROXIMATE DATE OF TRANSMISSION | DOCUMENT DESCRIPTION | HIGHEST CLASSIFICATION LEVEL OF INFORMATION IN DOCUMENT |
|---|---|---|---|
| 3 | Dec. 4, 2025 | Classified Document C: Printout containing screenshots of intelligence report relating to Country 1. | CONFIDENTIAL//NOFORN |
| 4 | Jan. 8, 2026 | Classified Document D: Printout of document containing information relating to Country 1 with header information removed. | SECRET//NOFORN |
| 5 | Jan. 8, 2026 | Classified Document E: Printout of document containing information relating to Country 1 and other foreign countries with header information removed. | SECRET//REL TO USA, NATO |

18 U.S.C. § 793(e).

## COUNT SIX
### (Retention of National Defense Information)

29.    Paragraphs 1 through 26 of this Indictment are incorporated by reference as though fully set forth herein.

30.    On or around January 8, 2026, in the District of Maryland and elsewhere, the defendant,

### AURELIO LUIS PEREZ-LUGONES

having unauthorized possession of, access to, and control over a document, writing, and note relating to the national defense, and information relating to the national defense which information he had reason to believe could be used to the injury of the United States or to the advantage of any foreign nation, willfully retained the same and failed to deliver it to any officer or employee of the United States entitled to receive it, to wit: **PEREZ-LUGONES** retained within his vehicle in

9

Laurel, Maryland the following document, writing, note, and information relating to the national defense:

| COUNT | DOCUMENT DESCRIPTION | HIGHEST CLASSIFICATION LEVEL OF INFORMATION IN DOCUMENT |
|---|---|---|
| 6 | Classified Document D: Printout of document containing information relating to Country 1 with header information removed. | SECRET//NOFORN |

18 U.S.C. § 793(e).

## NOTICE OF FORFEITURE

The Grand Jury for the District of Maryland further finds that:

31.    Upon conviction of the offenses in violation of Title 18, United States Code, Section 793(e) set forth in Counts One through Six of this Indictment, the defendant,

### AURELIO LUIS PEREZ-LUGONES,

shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 793(h) and Title 21, United States Code, Section 853, any property constituting or derived from any proceeds the defendant obtained, directly or indirectly, from any foreign government, or any faction or party or military or naval force within a foeign country, whether recognized or unrecognized by the United States, as the result of such violation.

32.    If any of the property described above, as a result of any act or omission of the defendant:

        a.   cannot be located upon the exercise of due diligence;

        b.   has been transferred or sold to, or deposited with, a third party;

        c.   has been placed beyond the jurisdiction of the court;

        d.   has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without

difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title

21, United States Code, Section 853(p), as incorporated by Title 18, United States Code,

Section783(h)(3).

18 U.S.C. § 793(h)
21 U.S.C. § 853

<div style="margin-left:40%">

Kelly O. Hayes
United States Attorney

By: _Kelly O. Hayes/peem_

Patricia McLane
Thomas M. Sullivan
Assistant United States Attorneys

John A. Eisenberg
Assistant Attorney General for National Security

By: _John a. Eisenberg /BPG_

Menno Goedman
Brendan Geary
Trial Attorneys
National Security Division

U.S. Department of Justice

</div>

A TRUE BILL:


**SIGNATURE REDACTED**

_____
Foreperson

_1-22-26_
Date